UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

DAVID VEST,
     Plaintiff,

     v.                              CASE NO.:  4:12-CV-039 SEB-TAB

LAYLA AL-SHAMI and
ADVANCED CORRECTIONAL HEALTHCARE,
     Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendants, Layla Al-Shami[1] and Advanced Correctional Healthcare, Inc.

(hereinafter "ACH"), by counsel, Kahn, Dees, Donovan & Kahn, LLP, file their

Memorandum of Law in Support of their Motion for Summary Judgment.

I.       **OVERVIEW OF THE CASE**

On or about April 5, 2012, Plaintiff David Vest filed a complaint with this Court

alleging that Defendants deprived him of Eighth Amendment rights under 42 U.S.C. §

1983.  Specifically, Plaintiff claims that Defendants were deliberately indifferent to his

serious medical needs resulting in irreparable injuries.  Plaintiff also claims that

Defendants were negligent in that they deviated from the standard of care required of

medical providers.

The undisputed facts demonstrate that Defendants provided reasonable and

appropriate medical care on each occasion that Plaintiff requested medical attention.

Plaintiff's symptoms were difficult to assess and diagnosing the underlying cause was

---

[1] Now Layla Al-Shami Troutman.

challenging.  Nothing in the record demonstrates Defendants were deliberately indifferent to Plaintiff's serious medical needs or that they deviated from the required standard of care.

## II.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.    Plaintiff was arrested on child pornography and child exploitation charges and incarcerated at the Jefferson County Jail (hereinafter "the JCJ") in Madison, Indiana from April 30, 2009 until his transfer to the Department of Corrections on April 16, 2010. (Deposition of David Vest, pg. 21, lines 15 – 18; pp. 32 line 18 – pg. 33 line 3; hereinafter "Pl.'s Dep.").

2.    At all times relevant to Plaintiff's Complaint, ACH provided medical services and medical supplies to incarcerated individuals at the JCJ pursuant to a contractual agreement between ACH, Jefferson County, Indiana and William Andrews, the Jefferson County Sheriff.  (Plaintiff's Complaint, ¶ 72; hereinafter "Pl.'s Compl.").

3.    ACH is considered a quasi-governmental entity.  (Pl.'s Compl., ¶ 72).

4.    ACH employed a licensed nurse (hereinafter "Jail Nurse") located at the JCJ.[2] (Deposition of Layla Al-Shami Troutman, pg. 52, line 25 – pg. 53, line 6 (hereinafter "Def.'s Dep.").

5.    Defendant Layla Al-Shami (hereinafter "Nurse Al-Shami") was a nurse practitioner employed by ACH to treat incarcerated persons at the JCJ and other contracting facilities.  (Def.'s Dep. pg. 8, lines 10 – 14; pg. 10, lines 12 – 20; pg. 17, lines 7 – 15).

---

[2] At various times, different nurses may have examined and treated Plaintiff.  As none of the nurses are named individually, for purposes of simplicity, they will be collectively referred to as "Jail Nurse."

6.      Nurse Al-Shami acts independently of ACH and prescribes medication and treats prisoners based on her medical knowledge, experience, and judgment. (Def.'s Dep. pg. 121, line 14 – pg. 122, line 3).

7.      Nurse Al-Shami has a Bachelor's of Science Degree in nursing, a Master's Degree as a nurse practitioner, and a degree in Bioethics and Medical Humanities. (Def.'s Dep. pg. 7, line 5 – pg. 11, line 14).

8.      Nurse Al-Shami is a board-certified registered nurse and a board-certified adult nurse practitioner.  (Id.).

9.      As a nurse practitioner, Nurse Al-Shami can independently diagnose and examine patients, prescribe medications, order tests, and determine appropriate plans of treatment.  (Def.'s Dep. pg. 9, lines 10 – 17).

10.      Plaintiff testified in his deposition that he was experiencing numbness in the fingers and thumbs on both of his hands and the toes on both of his feet at the time of his arrest.  (Pl.'s Dep. pg. 30, lines 9 – 21; pg. 33 line 25 – pg. 34 line 1).

11.      Plaintiff admits that he always received medical care within two (2) to three (3) days of the time he requested it during his incarceration at the JCJ.  (Pl.'s Dep. pg 47, lines 14 – 25).

12.      During 2009, Plaintiff was seen pursuant to his medical requests on at least five (5) separate occasions.  (Def.'s Dep. Ex. 1[3]).

13.      Plaintiff's next documented medical request was on or about January 24, 2010.  (Pl.'s Dep. pg. 47, lines 14 – 25).

---

[3] Exhibit 1 is inaccurate in that it lists Nurse Al-Shami as the provider when other professionals actually rendered the care.  (Def.'s Dep. pg. 43, lines 4 – 11).

14.     The Jail Nurse examined him on January 26, 2010.  (Def.'s Dep. Ex. 2; Def.'s Dep. pg. 43, lines 12 – 18).

15.     Nurse Al-Shami examined him on January 27, 2010 and assessed him with chronic pain due to arthritis.  (Pl.'s Dep., pg. 52, lines 2 – 14).

16.     During this January 27, 2010 examination, Nurse Al-Shami noted that Plaintiff's gait was normal and that his musculoskeletal strength was normal.  (Def.'s Dep. Ex. 3).

17.     Plaintiff completed a sick call request form on or about February 14, 2010. (Pl.'s Dep. pg. 47, lines 14 – 25).

18.     The Jail Nurse examined Plaintiff on February 16, 2010 for complaints of back pain and ambulation difficulties.  (Def.'s Dep. Ex. 4)

19.     Nurse Al-Shami examined Plaintiff on February 17, 2010 for his back pain and ambulation complaints.  (Def.'s Dep. Ex. 5).

20.     Nurse Al-Shami noted on February 17, 2010 that Plaintiff gave a history of a "benign muscle spasm disorder in his family" and prescribed ibuprofen for pain and amantadine for tremors.  (Id.).

21.     The Jail Nurse re-examined Plaintiff on February 18, 2010 and noted "[no complaints of] pain or discomfort.  Slow to move, no tremors noted when [inmate] being talked with by nurse.  Able to move and use [bilateral upper extremities] and [bilateral lower extremities]."  (Def.'s Dep. Ex. 6).

22.     On February 23, 2010, Plaintiff complained of shaking and sweating and the JCJ staff contacted emergency medical services from King's Daughters' Hospital in Madison, Indiana (hereinafter "EMS") for assistance.  (Def.'s Dep., Ex. 7).

23.     When EMS arrived on February 23, 2010, Plaintiff completed and signed a form documenting that he refused transportation and that he had been advised to seek medical treatment.  (Pl.'s Dep. pg. 59, lines 1 – 13).

24.     As a result of this February 23, 2010 episode, Dr. Al-Shami[4] placed Plaintiff on a medical watch by in order to monitor his objective symptoms.  (Def.'s Dep., Ex. 8).

25.     Nurse Al-Shami saw Plaintiff again on March 3, 2010 and ordered a "neurology consult ASAP" if his condition did not improve after taking Neurontin.  (Def.'s Dep., Ex. 9).

26.     On March 4, 2010, the Jail Nurse noted that [inmate] was "aware to inform jail officers or medical if needed."  (Def.'s Dep. Ex. 10).

27.     Nurse Al-Shami examined Plaintiff on March 8, 2010 and Plaintiff told her Neurontin was helping with his symptoms.  (Def.'s Dep. Ex. 11).

28.     During the March 8, 2010 examination, Nurse Al-Shami increased Plaintiff's dose of Neurontin and ordered a neurology consult.  (Def.'s Dep. Ex. 11).

29.     On March 16, 2010, Plaintiff was seen again by the Jail Nurse.  (Def.'s Dep. Ex. 12).

30.      During the March 16, 2010 the Jail Nurse instructed Plaintiff to notify the jail officers or medical staff as needed.  (Id.).

31.     On March 23, 2010, the Jail Nurse examined Plaintiff and noted that continued medical observation would occur until the neurology consult.  (Def.'s Dep. Ex. 13).

---

[4] Dr. Al-Shami is Layla Al-Shami Troutman's father.  He is a medical doctor and is an employee of ACH. He is not a defendant in this matter.

32.     Plaintiff complained of chest pain on March 24, 2010 and was treated by the JCJ staff that day for his symptoms.  (Def.'s Dep. Ex. 14).

33.     Plaintiff was seen again by the Jail Nurse on April 5, 2010 and April 13, 2010.  (Def.'s Dep. Ex. 17, Ex. 19).

34.     The Jail Nurse noted on April 13, 2010 that Plaintiff's complaints were inconsistent with her objective findings.  (Def.'s Dep. Ex. 19).

35.     Nurse Al-Shami examined Plaintiff on April 6, 2010 and April 14, 2010. (Def.'s Dep. Ex. 16, Ex. 18).

36.     Nurse Al-Shami undertook an extensive physical examination and discussed Plaintiff's complaints in detail on both the April 6, 2010 and April 14, 2010 visits.  (Def.'s Dep. Ex. 16, Ex. 18).

37.     Nurse Al-Shami noted that the neurology consult was still pending during the April 14, 2010 visit. (Def.'s Dep. Ex. 18).

38.     In conjunction with her requested neurology consult, Nurse Al-Shami ordered a CT and a MRI.  (Def.'s Dep. pg. 111, lines 15 – 18).

39.     The responsibility of scheduling and coordinating off-site medical appointments rested with the JCJ staff.  (Def.'s Dep. pg. 119, line 22 – pg. 120, line 4).

40.     Sometime during April 2010, Nurse Al-Shami spoke with a physician at ACH regarding the neurology consult and the delay associated with the JCJ's failure to coordinate the scheduling and transportation.  (Def.'s Dep. pg. 97, lines 4 – 9; pg. 119, lines 2 - 21).

41.     Nurse Al-Shami received reports from the JCJ staff that during the time Plaintiff was under medical observation, his symptoms seemed to wax and wane. (Def.'s Dep. pg. 123, lines 18 – 22).

42.     Considering the totality of information available to Nurse Al-Shami, her opinion was that Plaintiff's medical situation was urgent but not emergent because his complaints were not consistent with an acute medical emergency and his symptoms were stable.  (Def.'s Dep. pg. 122, line 15, pg. 123, line 4).

43.     On or about April 16, 2010, Plaintiff was transferred from the JCJ.  (Pl.'s Compl. ¶ 53).

44.     Plaintiff underwent cervical spine fusion surgery performed by Dr. Richard B. Rodgers and others on April 23, 2010.  (Pl.'s Compl. ¶ 60.

45.     Plaintiff has identified Richard B. Rodgers, MD as a potential expert in this matter regarding the alleged delay in treatment of his spinal stenosis.  (Plaintiff's Answers to Interrogatories, Ans. No. 9).

46.     Dr. Rodgers' deposition was taken on April 25, 2013 wherein he testified that when patients first complain of symptoms of spinal cord issues[5], nonsurgical treatment and conservative measures are part of accepted medical practice. (Deposition of Richard B. Rodgers, MD (hereinafter "Dr. Rodgers Dep.") pg. 54, line 18 – pg. 55, line 2).

47.     Dr. Rodgers also testified that once it is clear that a patient's symptoms are not improving with conservative therapy, the next step is to order diagnostic testing. (Dr. Rodgers Dep. pg. 56, lines 4 – 7; pg. 72, lines 2 – 4).

48.     Dr. Rodgers further testified that six (6) weeks of conservative therapy for possible spine-related complaints is within the realm of reasonable medical treatment. (Dr. Rodgers Dep. pg. 72, lines 2 – 4).

---

[5] Dr. Rodgers noted muscle weakness, muscle spasticity, and numbness are characteristic symptoms of spinal cord issues.  Plaintiff made complaints mirroring these symptoms.

49.    Finally, Dr. Rodgers testified that he was not able to render an expert

opinion as to any standard of care issues.  (Dr. Rodgers Dep. pg. 73, line 23 – pg. 74,

line 11).


### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is permissible when "there is no genuine issue as to any

material fact and….the moving party is entitled to judgment as a matter of law." *Smith*

*v. Severn,* 129 F.3d 419 (7th Cir. 1997) (quoting Fed. R. Civ. P. 56(C)).  The nonmoving

party cannot rest on the pleadings alone, but must identify specific facts to establish a

genuine triable issue of fact.  *Id.* at 425.

In *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986) the Supreme Court

construed Rule 56 as mandating that summary judgment must be entered "against a

party who fails to make a showing sufficient to establish an essential element to the

party's case, and on which that party will bear the burden of proof at trial…since a

complete failure of proof concerning an essential element of the non-moving party's

case necessarily renders all other facts immaterial."  *Id.* at 322-23.  The initial burden

lies with the moving party to inform the court of the basis for its motion and to identify

those portions of the record that it believes demonstrate the absence of a genuine issue

of material fact.  *Id.* at 323.  This burden may be discharged by demonstrating that there

is an absence of evidence to support the non-moving party's case.  *Id.* at 325.  A party

opposing a properly supported motion for summary judgment may not rest upon mere

allegations or denials of his pleadings, but must set forth specific facts showing that

there is a genuine issue for trial.  *Id.* at 322.

To avoid summary judgment, Plaintiff must establish that sufficient evidence exists for a jury to return a verdict for him.  *Harbor House Condominium Assoc. v. Mass. Bay Ins. Co.,* 915 F.2d 31 (7th Cir. 1990); *Hines v. British Steel Corp.,* 907 F.2d 726 (7th Cir. 1990).  Plaintiff cannot rest on his pleadings, but must designate material facts at issue that are outcome-determinative under the applicable law.  *Hughes v. Joliet Corr. Ctr.* 931 F.2d 425 (7th Cir. 1991); *Johnson v. Pelker,* 891 F.2d 136 (7th Cir. 1989).

## IV.   LEGAL ANALYSIS

### A.  The deliberate indifference standard

Plaintiff alleges that the Defendants violated the Eighth Amendment's prohibition on cruel and unusual punishment by acting with deliberate indifference to his serious medical needs.  The Supreme Court has interpreted the Eighth Amendment's proscription against cruel and unusual punishment as imposing a duty upon state actors through the Fourteenth Amendment, to provide adequate medical care to incarcerated individuals.  *Boyce v. Moore,* 314 F.3d 884, 888-89 (7th Cir. 2002), citing *Estelle v. Gamble,* 429 U.S. 97, 103 (1976).  "Adequate medical care" does not require that a prisoner have unqualified access to healthcare, *Id.*, nor does it require that the state provide the "best possible care."  *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006).  Rather, deliberate indifference as to medical care requires obduracy and wantonness not inadvertence and good faith error.  *Whitley v. Albers,* 475 U.S. 312, 319 (1986).

To prove that a state actor acted with deliberate indifference as to a prisoner's medical needs, the prisoner must demonstrate: 1) that, objectively, his medical need was sufficiently serious; *and* 2) that, subjectively, the state actor had access to facts

from which an inference can be drawn that there was a substantial risk of serious harm to the prisoner if his serious medical need was disregarded and that the state actor then drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, a state actor must act with subjective recklessness in that he/she had actual knowledge of impending harm and consciously refused to prevent the impending harm from occurring. *Id.* at 839; *Salazar v. City of Chicago*, 940 F.2d 233, 239 (7th Cir. 1991).

      *1.  Objective component*

An objectively serious medical need is one that has been diagnosed by a physician and that requires medical treatment, or is so obvious that even a lay person would easily recognize the need for medical attention. *Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007); *Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006); *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002). An objectively serious medical need is one that rises to the level of an injury that is life-threatening or poses a risk of needless pain or a risk of a lingering disability if not treated. *Pinkston v. Madry* at 892.

      2. *Subjective component*

The Supreme Court has established that "subjective recklessness" as used in criminal cases is consistent with the constitutional requirements posed by the Eighth Amendment  and has adopted it as the test for "deliberate indifference." *Farmer v. Brennan*, 511 U.S. at 840. In order for a prisoner to prove that a state actor had the requisite intent to disregard the risk attendant to his serious medical needs, he must show that the risk was so obvious that any reasonable person would recognize that ignoring it would constitute criminal recklessness. *Id.* at 842. This reckless conduct must be so dangerous that the deliberate nature of the conduct is inferred. *Foelker v. Outagamie County*, 394 F.3d 510, 513 (7th Cir. 2004).

The standard for medical professionals requires more than a finding of medical negligence or heightened standard of gross medical negligence.  *King v. Kramer,* 680 F.3d 1013, 1019 (7th Cir. 2012).  To create an inference that a medical professional was deliberately indifferent to a prisoner's serious medical needs, the professional's medical decisions must be a "substantial departure from accepted professional judgment, practice, or standards" as to demonstrate that the professional did not base her medical decisions on such a judgment, practice, or standard.  *Id.* citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).  To survive summary judgment, there must be a question of material fact as to whether a practitioner's treatment was "so far afield" from the appropriate medical response that it falls "outside the bounds of professional judgment." *Id.*

**B.  Liability of a quasi-governmental entity**

Section 1983 does not create vicarious liability for quasi-governmental entities. *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013).  An organization is answerable for its own policies, but not for the actions of its employees.  *Id.*  If a particular policy or procedure does no harm, there is no possible relief.  *Id.*  In order for a plaintiff to have a recognizable claim against a corporate defendant under section 1983, he must show that his injury was the result of the corporation's official policy and/or procedure.  *Rice v. Corr. Med. Servs. (In re Estate of Rice),* 675 F.3d 650, 675 (7th Cir. 2012).

A recognizable claim of deliberate indifference of a plaintiff's serious medical needs requires proof that the corporate defendant had a policy and/or procedure "evincing deliberate indifference" that resulted in harm.  *Id.* at 676.  A plaintiff's claim is insufficient in the absence of an identifiable policy and/or procedure that supports a

finding that the corporation was deliberately indifferent.  *Id.* Simply alleging broad

allegations against the corporation, such as inadequate training, staffing, or lack of

equipment, without implicating a corporate policy, does not meet the deliberate

indifference standard.  *Id.*

## V.   ARGUMENT

### A.  Nurse Al-Shami was not deliberately indifferent to Plaintiff's medical serious medical needs

In order to prevail on his claim, Plaintiff must demonstrate that Nurse Al-Shami's

treatment was not based on her professional judgment, but rather was "so far afield" as

to constitute criminal recklessness.  Plaintiff must show that Nurse Al-Shami's treatment

of him was such a departure from accepted medical practice that her decisions *clearly*

had no basis in medicine.  The required proof must demonstrate that her actions went

beyond even "gross medical negligence."

Assuming that Plaintiff's medical condition met the standard of being an

objectively serious medical condition, Nurse Al-Shami rendered appropriate medical

care under the circumstances.  There are no facts in the record that demonstrate Nurse

Al-Shami had access to facts that would allow for an inference that Plaintiff had a

substantial risk of experiencing serious harm if his serious medical needs were

disregarded, let alone that she drew such an inference.  As noted *supra*, deliberate

indifference entails conduct that is so egregious and reckless that its deliberate nature is

inferred.

Reviewing a timeline of Nurse Al-Shami's care[6] is instructive:

- January 27, 2010 – Plaintiff related symptoms of numbness and pain in his legs, numbness in his left foot, and stated his significant complaint was the pain in his shoulders.  He denied that he had difficulty walking.  Nurse Al-Shami noted that his gait was normal and his muscle strength was 5/5.  She prescribed ibuprofen for his pain. (Def.'s Dep., Ex. 3).

- February 17, 2010 – Plaintiff complained of tremors in his left lower extremity and related to Nurse Al-Shami that he had a family history of benign muscle spasm disorder.  Nurse Al-Shami noted that Plaintiff had no neurological deficit.  She continued the regimen of ibuprofen and ordered amantadine for Plaintiff's tremors.  (Def.'s Dep., Ex. 5).

- February 23, 2010 – Plaintiff complained of shaking and sweating.  Plaintiff refused to be transported for further medical treatment at King's Daughters' Hospital in Madison, Indiana.  (Def.'s Dep., Ex. 7).

- March 3, 2010 – Plaintiff complained of increased weakness.  However, Nurse Al-Shami noted that the JCJ staff told her that Plaintiff "is functioning fine and walking fine."  She noted that neurologically, Plaintiff was complaining of numbness in both his hands and that he had to sometimes use the wall to steady himself while walking.  Nurse Al-Shami prescribed Neurontin to treat his nerve pain and tremors.  **She requested a neurology consult ASAP** if his condition did not improve. Lastly, she

---

[6] These are the only dates Nurse Al-Shami treated Plaintiff (with the exception of February 23, 2010 when Nurse Al-Shami did not participate in his treatment) prior to requesting a neurology consult.

requested the JCJ staff to continue to monitor Plaintiff and "document [Plaintiff's] functional status.  (Def.'s Dep., Ex. 9).

- March 8, 2010 – Plaintiff told Nurse Al-Shami that Neurontin was "helping some."  She noted her concern that his presentation did not coincide with his reported history of benign tremors.  Due to this concern, she ordered a neurology consult along with increasing his dosage of Neurontin.  (Def.'s Dep., Ex. 11).

As this timeline demonstrates, Nurse Al-Shami was not deliberately indifferent to Plaintiff's medical needs.  The first time she met with Plaintiff, his primary complaint was shoulder pain.  She prescribed ibuprofen for his chronic pain.  Her treatment was not outside the realm of medical judgment or practice.

During Plaintiff's second visit, his main symptoms were tremors and shakes.  He gave Nurse Al-Shami a history of "benign muscle spasms."  She maintained the ibuprofen for pain and added amantadine – a drug used to treat conditions such as Parkinson's disease – for his complaints of tremors.  Again, her treatment was within the realm of accepted medical judgment and practice.

Plaintiff's third visit with Nurse Al-Shami was exactly five (5) weeks from the time of his first visit and well within the six (6) week conservative management timeframe that Dr. Rodgers testified was reasonable.  At this visit, Plaintiff related that his complaints were increasing in severity.[7]  Because Plaintiff told Nurse Al-Shami amantadine was not helping, she prescribed Neurontin and ordered a neurology consult if his condition did not improve.  Nurse Al-Shami's treatment mirrors Dr. Rodgers' recommended plan of action – alter the treatment if a patient's condition worsens.

---

[7] The JCJ staff told Nurse Al-Shami that Plaintiff's was functioning and walking "fine."

Nurse Al-Shami changed Plaintiff's medication to Neurontin and noted that a neurology consult would be necessary if it did not help his symptoms.  Her treatment was well within the bounds of accepted medical judgment and practice.

On March 8, 2010, slightly less than six (6) weeks from his first visit, Plaintiff again complained of muscle weakness, but noted that Neurontin was "helping some." Nurse Al-Shami increased the dosage of Neurontin and ordered a neurology consult. Once again, her plan of treatment was consistent with the treatment outlined by Dr. Rodgers.  There is nothing that shows Nurse Al-Shami's treatment was so far outside the realm of the accepted standards of practice as to have absolutely no medical basis.

Nurse Al-Shami saw Plaintiff three (3) more times – March 31, 2010; April 6, 2010; and April 14, 2010 – prior to his transport from the JCJ.  Each time, Nurse Al-Shami noted that a neurology appointment was pending.  In addition to referring Plaintiff to a neurologist, she had scheduled a CT and a MRI.

In sum, in less than three (3) months' time, Nurse Al-Shami met with Plaintiff on at least six (6) occasions (each time was within two (2) to three (3) days of his request for treatment).  There is no evidence that she ignored or dismissed his complaints despite the information given to her by the JCJ staff that his symptoms were sometimes absent.  She treated him pursuant to a definitive medical plan on each occasion he presented to her for care.  She monitored his treatment, prescribed medication, ordered diagnostic tests, and referred him for a neurology consult.

Furthermore, there was no indication that Plaintiff's condition was "emergent" in nature and required immediate surgical intervention.  In fact, on February 22, 2010 Plaintiff signed off on a form noting that he refused to be transported to a hospital for treatment.  Plaintiff's refusal to visit the hospital provided support to the reports Nurse

Al-Shami was receiving about his inconsistent complaints and the non-emergent nature of his condition. It was reasonable for her to conclude that based on the information she was receiving about Plaintiff, that her plan of conservative treatment was appropriate. Once she felt that his symptoms might be getting worse and that he may not be benefitting from conservative measures, she requested a neurology consult.

Nurse Al-Shami requested this neurology consult for a reason – because she felt that Plaintiff's symptoms may be beyond her area of expertise.  She recognized this within six (6) weeks from the date she first saw Plaintiff.  Unfortunately, the transportation and coordination of the consult was outside of her control.  Nurse Al-Shami does not have the authority or ability to transport inmates to appointments.  The logistics necessarily needed to be coordinated by the JCJ personnel.  Any delay in obtaining a neurology consult was not due to Nurse Al-Shami's deliberate indifference.

The material facts not in dispute demonstrate that Nurse Al-Shami was cognizant of Plaintiff's complaints; that she attempted to manage his complaints with a combination of different medications, rest, exercise, and stretching; and that once Nurse Al-Shami reached the conclusion based on sound medical judgment that Plaintiff's complaints were not responding to the treatment, she made the appropriate referral to a neurologist and ordered diagnostic testing.  Her treatment was neither so far afield as to not be based on medical judgment nor criminally reckless as to constitute deliberate indifference.  As such, she is entitled to summary judgment on Plaintiff's claims brought under 42 U.S.C. § 1983.

B. **ACH's policies and procedures did not demonstrate deliberate indifference to Plaintiff's serious medical needs**

As noted *supra*, Plaintiff must demonstrate that ACH had a policy or procedure in place that evinced deliberate indifference to his serious medical needs.  There are no material facts in issue that demonstrate ACH had such a policy of procedure in place.  In fact, Plaintiff notes that he was seen within two (2) to three (3) days each time he filled out a request for medical attention.  These requests for medical attention were not emergency medical concerns.  On the occasions that Plaintiff had an emergent concern – the inmate assault in May 2009, his weakness and sweating in February 2010, and his complaints of chest pain in March 2010 – he received immediate medical care.

During the time of his incarceration – from May 2009 through April 2010 – Plaintiff was seen by medical staff on twenty-five (25) occasions.  Plaintiff received medication and access to medical care.  ACH clearly outlines its fundamental policy of being attentive to the medical needs of prisoners.  ACH's attendant policies and procedures allow its staff to consistently treat prisoners within a reasonable timeframe based on their complaints.

In short, Plaintiff merely alleges broad allegations against ACH of inadequate staffing, lack of equipment, and insufficient training.  There is no evidence in the record that ACH had any identifiable policies that support a finding of deliberate indifference.  There is no ACH policy that dictates how Nurse Al-Shami renders medical care to prisoners.  She is able to exercise independent judgment based on her medical knowledge, skill, and experience. As such, ACH is entitled to summary judgment on Plaintiff's claims brought under 42 U.S.C. § 1983.

## VI.    PLAINTIFF'S MEDICAL MALPRACTICE CLAIMS

In Counts III and IV of his Complaint, Plaintiff also alleges causes of action against both ACH and Nurse Al-Shami for common law medical malpractice.  As acknowledged in Plaintiff's Complaint, Plaintiff has the burden of establishing the elements of a duty owed to him, a breach of the duty, and damage to him proximately caused by the breach.  In a medical negligence claim, breach of duty by a health care provider is generally defined as a deviation from the applicable standard of care.  The applicable standard of care required of a health care provider is that degree of care and skill exercised by reasonably careful, skillful, and prudent practitioners in the same class to which the practitioner belongs, acting under the same or similar circumstances. *Oelling v. Rao* (1992), Ind., 593 N.E.2d 189, 191.

With respect to Nurse Al-Shami, it is undisputed that she owed a duty of reasonable care to the Plaintiff, who was her patient and an inmate at the Jefferson County Jail.  However, a breach of duty in a medical negligence claim must generally be established by expert testimony as to the applicable standard of care and that the care provided by the medical professional fell below that standard.  *Widmeyer v. Faulk* (1993), Ind. App., 612 N.E.2d 1119, 1122.

Plaintiff has failed to produce expert testimony from a healthcare provider to establish the standard of care applicable to the medical treatment rendered by Nurse Al-Shami and has failed to present an expert opinion that Nurse Al-Shami deviated from a reasonable care standard in providing medical care to Plaintiff.  In interrogatories propounded to Plaintiff and answered by Plaintiff on October 10, 2012, Plaintiff was asked to identify each of his expected expert witnesses and to state the facts and opinions to which the expert is expected to testify.  In his answer, Plaintiff indicated that

Dr. Richard B. Rodgers is "reasonably expected to testify that Mr. Vest has been permanent [sic] disabled as the result of the delay in treatment." Plaintiff has yet to identify any other expert witness to testify on the issues of standard of care and breach of the standard of care.

Dr. Rodgers was deposed on April 25, 2013. In his deposition, Dr. Rodgers testified that he has not reviewed medical records from the Jefferson County Jail and, therefore, is not in any position to testify on standard of care issues.

Without expert testimony, Plaintiff cannot establish the essential elements of his case on which he bears the burden of proof at trial. Therefore, he has failed to demonstrate a genuine issue of material fact with respect to the issue of breach of the applicable standard of care, entitling defendants to summary judgment.

As Nurse Al-Shami was an employee of ACH at the time she was rendering medical care to Plaintiff, ACH may be liable for any malpractice of Nurse Al-Shami. The discussion concerning Plaintiff's failure to establish breach of duty through expert testimony is applicable to ACH as the employer of Nurse Al-Shami. However, Plaintiff also appears to allege that ACH owed some type of independent duty to him. ACH is a corporation, not a person or an individual health care provider. As such, ACH is a creature of statute and can neither practice medicine nor act in person. Although Plaintiff has alleged that ACH owed a duty to him, he has not plead any facts upon which such a duty may arise. Plaintiff alleges in his Complaint that ACH contracted with the Jefferson County Jail to provide medical services at that facility. However, any duty owed contractually by ACH was owed to the Jefferson County Jail. Plaintiff has alleged no facts upon which an independent duty was owed to him by ACH. While ACH may be liable to Plaintiff for acts of its employee, Nurse Al-Shami, ACH did not owe any

240353

independent duty to Plaintiff, and Plaintiff has alleged no facts and has presented no evidence upon which such a duty could arise.

Nurse Al-Shami and ACH are entitled to summary judgment in their favor as to the medical malpractice causes of action referenced by Plaintiff in Section 5 of his Complaint for the reason that Plaintiff has failed to present expert testimony establishing the standard of care owed by Nurse Al-Shami to Plaintiff and has failed to present any expert testimony establishing a breach of that standard of care.

## VII.   CONCLUSION

Based on the above and foregoing reasons, Defendants respectfully request that this Court grant summary judgment in favor of Defendants as to all Counts contained in Plaintiff's Complaint.

Respectfully submitted,

KAHN, DEES, DONOVAN & KAHN, LLP

By:   s/ Michele S. Bryant
    Michele S. Bryant, Atty. #14533-55A
    mbryant@kddk.com
    Michael G. Smith, Atty. # 23150-53
    msmith@kddk.com

KAHN, DEES, DONOVAN & KAHN, LLP
501 Main Street, Suite 305
Post Office Box 3646
Evansville, Indiana  47735-3646
Phone:  (812) 423-3183
Facsimile:  (812) 423-3841

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of May, 2013, a copy of the foregoing Motion for Summary Judgment was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's CM/ECF system.

J. Clayton Culotta
Email:  *clay@culottalaw.com*


s/ Michele S. Bryant
Michele S. Bryant