UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| DAVID VEST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | No. 4:12-cv-00039-SEB-TAB |
| LAYLA AL-SHAMI, ) | |
| ADVANCED CORRECTIONAL ) | |
| HEALTHCARE, INC., ) | |
| ) | |
| Defendants. ) | |

**PARTIAL GRANT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment [Docket No. 40], filed on May 15, 2013. For the reasons set forth below, the motion is GRANTED with respect to Plaintiff's claims under 42 U.S.C. § 1983. We address Plaintiff's state-law medical malpractice claims in a separate order, issued concurrently.

**Factual Background**

Plaintiff David Vest was arrested on child pornography and child exploitation charges and incarcerated at the Jefferson County Jail in Madison, Indiana on April 30, 2009. Def.'s Br. 2. He remained incarcerated there until his custody was transferred to the Indiana Department of Corrections on April 16, 2010. *Id.* Defendant Advanced Correctional Healthcare, Inc. ("ACH") is a medical services organization that, during the time of Plaintiff's incarceration, was under contract with Jefferson County to provide medical services at the Jefferson County Jail. Compl. ¶ 8. Defendant Layla Al-Shami is a registered nurse practitioner, employed by ACH, who served

1

in the Jail as a "site practitioner" during the time of Plaintiff's incarceration Compl. ¶ 7; Defs.' Br. ¶¶7–9.

At the time of his arrest in April 2009, Plaintiff told officers as part of his intake procedure that he was experiencing some "tingling" in his fingers and toes. Vest Dep. 33–34. He did not initially ask for medical attention, nor was he taking any medication for these symptoms at the time. *Id.* Several days after his arrival at the Jail, Plaintiff was beaten by other prisoners, suffering injuries to his head, shoulders, and face. *Id.* at 35–36. In the aftermath of this assault, Plaintiff reported that he was experiencing greater numbness and tingling in his hands and feet. Compl. ¶ 11. Upon putting in a "sick call"—a request for medical attention at the Jail—Plaintiff saw a member of the jail medical staff and was given Tylenol. *Id.* at 12–13. In September 2009, Plaintiff put in three sick calls to complain of what he thought were sciatica symptoms. Jail medical staff members saw him on three occasions, prescribing Ibuprofen; according to Plaintiff, the medication did not relieve his symptoms. *See* Compl. ¶ 14–15; Pl.'s Ex. 1. Plaintiff asked for and received medical attention five times during the course of 2009. Pl's Ex. 1. [1]

In December 2009, Plaintiff began to experience involuntary contraction of the third and fourth fingers of his left hand, difficulty walking on his left leg because it was "dragging," leg tremors, and pain in his limbs. After putting in a sick call two days earlier, he saw a jail nurse on January 26, 2010; Al-Shami then examined him on January 27.[2] Defs.' Br. 4, ¶¶ 14–16. Noting that his gait and musculoskeletal strength (assessed using a grip test) seemed normal, Al-Shami deemed the symptoms consistent with arthritis and prescribed Ibuprofen to alleviate pain. Pl.'s Ex. 2. Plaintiff put in another sick call on February 14, after which he was examined by the jail

---

[1] Plaintiff's Exhibit 1 lists Layla Al-Shami as the "provider" for these 2009 visits, but Defendants maintain that other jail personnel actually administered the care. Def.'s Br. 3 n.1. The records of these 2009 visits have not been introduced by either party into the record.

[2] Al-Shami expressed uncertainty whether the primary jail nurse, whom she refers to as Denise Housen, was an employee of ACH. *See* Al-Shami Dep. 119.

nurse on February 16 and by Al-Shami on the following day. While being examined by Al-Shami, Plaintiff complained of back pain and difficulty with ambulation as well as tremors; he also noted to her that he had a history of "benign muscle spasms" in his family. Pl.'s Ex. 5. Al-Shami recorded that he presented with a shuffling gait, tremors in his limbs and difficulty straightening the third and fourth fingers in his left hand, but she also recorded that his "activities of daily living" remained intact. *Id.* She prescribed Ibuprofen for pain and Amantadine for the tremors, and wrote that he should be monitored for difficulties with daily living activities and any worsening of symptoms. *Id.* The jail nurse saw Plaintiff again the next day, and noted that he manifested "[no complaints of] pain or discomfort. Slow to move, no tremors noted when being talked with by nurse. Able to move and use [bilateral upper extremities] and [bilateral lower extremities.]" Pl.'s Ex. 6; Defs.' Br. 4, ¶ 21.[3]

On February 23, 2010, Plaintiff awoke on the floor of his cell and had difficulty in standing up; he felt numbness and weakness in his legs and on the right side of his body. Compl. ¶¶ 23–25. Jail staff contacted King's Daughters' Hospital in Jefferson County, which dispatched EMTs to the Jail in response to Plaintiff's distress. Defs.' Br. 4, ¶ 22. Plaintiff believed at the time that he had suffered a stroke, and the responding EMTs measured his blood pressure at the high level of 140/120. Compl. ¶¶ 27, 31. While being treated by the EMTs, Plaintiff signed a form stating that he "refused" to be transported to the hospital. *See* Pl.'s Ex. 7. While he does not deny signing this form, Plaintiff maintains that he was in such distress at the time that he did not read or understand what he was signing; Plaintiff insists now that he wanted to go to the hospital but the EMTs told him that would not be possible.[4] Vest. Dep. 59–60. After this incident,

---

[3] The nurse's note uses abbreviations which Defendants have translated in a manner not objected to by Plaintiff.
[4] Neither the EMTs nor Kings' Daughters' Hospital are defendants in this matter, nor are they affiliated with Al-Shami or ACH.

3

Plaintiff was placed on "medical watch" to allow jail staff to monitor his symptoms more closely. Defs.' Br. 5, ¶ 24.

According to Plaintiff, his symptoms steadily worsened; he reported increasing numbness and tremors coupled with extreme difficulty in walking—to the point that he had to use a wall to steady himself or seek assistance from other inmates. Pl.'s Ex. 9. He saw Al-Shami again on March 3, 2010, and she noted that Plaintiff's presentation of symptoms conflicted with the reports of jail staff, who related that Plaintiff was "functioning and walking fine" when not being watched by medical personnel.[5] *Id.* She nevertheless observed several objective symptoms, including tremors and a strength of grip that was weaker in his left hand than his right. *Id.* Al-Shami prescribed Neurontin to combat the neurological symptoms and the tremors, and she wrote that Plaintiff should undergo a "neurology consult ASAP if condition doesn't improve [with] Neurontin"; she also ordered that Plaintiff remain on medical watch for another week with monitoring of symptoms. *Id.*[6] According to her testimony, it was also at this time that Al-Shami ordered MRI and CT scans for Plaintiff, though the scans were not ultimately performed until later. *See* Al-Shami Dep. 95. Five days later, Al-Shami examined Plaintiff again. According to her patient notes, Plaintiff told her that the Neurontin was helping ease his symptoms; she therefore increased his dosage and additionally prescribed Colace to alleviate the constipation he

---

[5] In her deposition, Al-Shami denies ever believing that Plaintiff was "malingering," but she stated that the contrast between self-described symptoms (many of which were subjective rather than objectively measurable) and the observations of jail staffers was a factor to be taken into account in her attempts to analyze Plaintiff's condition—as a supplement to her independent observations and judgment. *See* Al-Shami Dep. 111–113.

[6] Plaintiff disputes that Defendant Al-Shami ever "ordered" the neurological consult. While not denying that she made notations that such a consult should be conducted, he apparently contends that she never conveyed this order to prison personnel responsible for scheduling off-site medical attention. *See* Pl.'s Resp. 3. The only evidence cited by Plaintiff for this proposition is the report submitted by Dr. Stephen Payne, who opined that there was "no evidence that a neurological consultation was ordered at that time, and no evidence that the primary-care provider, Layla Al-Shami, attempted in any way to expedite consultation or testing for David Vest." *See* Docket No. 48, Ex. 5 at ¶ 2. The record as it stands is devoid of conclusive evidence that Al-Shami communicated her order that Plaintiff receive a neurological consultation immediately following the March 3 examination; for the purposes of this summary judgment motion we accept as undisputed only what the record affirmatively shows: that Al-Shami recorded the need for a consultation in her patient notes for Plaintiff on March 3, and repeated the notation on several subsequent occasions.

4

reported. Pl.'s Ex. 11. In his deposition, Plaintiff maintains that neither Neurontin nor the other medications prescribed by Al-Shami mitigated his symptoms, and he denies having reported to al-Shami that the Neurontin was effective during the March 8 examination. Vest Dep. 71. Plaintiff visited the Jail nurse again on March 16 and March 23; the nurse continued Plaintiff's medical watch status pending the neurology consult. Pl.'s Ex. 12, 13.

Al-Shami examined Plaintiff twice more in April 2010. On April 6, she reviewed the notes of the Jail nurse who had seen Plaintiff the previous day, and she recorded: "Staff states inmate sleeping all the time . . . . Increased Neurontin not helping signs and symptoms. Vital signs have been stable. General condition same." Al-Shami Dep. 88–89. Plaintiff also reported to Al-Shami that he had "jolts of electricity down his spine," and he expressed a desire to schedule his neurology consultation before his upcoming trial date. *Id*; Pl.'s Ex. 16. Al-Shami testifies that, despite her experience in treating patients with neurological issues, she was unfamiliar with the "electrical jolts" Plaintiff described to her. Al-Shami Dep. 89. Al-Shami also testifies that, after her April examinations of Plaintiff, she discussed Plaintiff's case with other ACH staff and expressed concern to jail officials about the delay in the neurological consultation that she had requested for Plaintiff.[7] *Id.* at 96–97, 119. According to Al-Shami, the responsibility for scheduling and coordinating off-site visits rested with Jail staffers. *Id.* at 119.[8] Al-Shami testifies that as of April 2010, she viewed Plaintiff's status as "urgent, but not emergent"—meaning that his symptoms were not improving adequately with the treatment available at the Jail, but that his life signs were stable and there did not seem to be any "acute" danger. Al-Shami Dep. 122.[9]

---

[7] According to Al-Shami, she spoke to Dr. Norman Johnson and her father Dr. Al-Shami—both affiliated with ACH—and with jail commander Ken Baker.

[8] Plaintiff points to a different portion of Al-Shami's deposition, where she states: "Sending the patient off-site was at the discretion of the practitioner." Al-Shami Dep. 29. However, this remark appears to be referring to medical staff members' ability to order/request that off-site appointments be made rather than their responsibility to arrange for scheduling and transportation of the prisoners—a mandate she later affirms rests with Jail officials.

[9] Her full explanation was as follows:

5

On April 16, 2010, Plaintiff was transferred out of the Jefferson County Jail to the Indiana Department of Corrections in Plainfield, Indiana, and neither Al-Shami nor any other ACH employees had further contact with him. Compl. ¶ 53; Def.'s Br. 7. In an examination at Wishard Hospital, Dr. Richard B. Rodgers diagnosed Plaintiff with spinal stenosis. Dr. Rodgers performed cervical spine fusion surgery on April 23, 2010 to address Plaintiff's condition. Compl. ¶ 60. Plaintiff pleaded guilty to the charges against him, and served the remainder of his sentence in Plainfield, after which he was released to King's Daughters' Hospital in Jefferson County. As of February 2013, he was residing at a nursing facility in Bedford, Indiana, and treatment for his spinal stenosis was ongoing, and he resided at a nursing facility in Bedford, Indiana. According to Plaintiff, despite rehabilitation efforts, he remains a "quadriplegic C3 incomplete," with only limited use of all four of his extremities. Vest Dep. 111. Dr. Rodgers, whose group has been responsible for Plaintiff's treatment and rehabilitation since his initial surgery in 2010, opines that earlier diagnosis or surgical intervention would likely have improved Plaintiff's long-term prognosis: "If there had been some intervention at a time when he had started to notice weakness, then definitely his neurological outcome would have been different . . . . [O]nce it becomes symptomatic and you start to notice progression in symptoms, it continues to be progressive until there's an intervention." Rodgers Dep. 15–16.

---

> [H]is condition was not improving with my plan of care and was in need of further treatment and evaluation as soon as possible to avoid any type of deterioration that could possibly occur. [Not] [e]mergent meaning his vital signs were stable. He was, as far as my notes can tell, able to get around okay, take care of himself okay. His activities of daily living were okay, from my assessment . . . . He wasn't having an acute episode of something that would need immediate evaluation."

## Legal Analysis

### Standard of Review

Summary judgment is appropriate on a claim if the moving party can show that there is no genuine dispute as to any material fact, leaving them entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the Amere existence of some alleged factual dispute between the parties,@ *id.*, 477 U.S. at 247, nor the existence of Asome metaphysical doubt as to the material facts,@ *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Here, the Defendants as the moving party Abear the initial responsibility of informing the district court of the basis for [their] motion," and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Because Plaintiff, the non-moving party, will bear the burden of proof at trial, Defendants may discharge their burden at this stage of the proceedings by showing an absence of evidence to support Plaintiff's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in Plaintiff's favor, if genuine doubts remain and a reasonable fact-finder could find for Plaintiff, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). But if it is clear that Plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element Anecessarily renders all other facts immaterial.@ *Celotex*, 477 U.S. at 323.

## Discussion

Plaintiff has brought federal and state claims against both Layla Al-Shami and Advanced Correctional Healthcare. His federal claim arises under 42 U.S.C. § 1983, based on Defendants' treatment of him while in the Jefferson County Jail, which he claims violated the Eighth Amendment, applicable to state actors through the Fourteenth Amendment. Plaintiff also alleges that Defendants committed medical malpractice, a tort defined by the common law of Indiana and subject to the procedural requirements of the state's Medical Malpractice Act. We address here only Plaintiff's federal claims under 42 U.S.C. § 1983; the state law claims against Defendants are addressed in a concurrently issued order.

### I.   Eighth Amendment "Deliberate Indifference"

Plaintiff's suit under 42 U.S.C. § 1983 alleges that Defendants Al-Shami and ACH, acting under "color of state law," violated his constitutional rights. Defendants concede that ACH's relationship with the Jefferson County Jail renders it a "quasi-governmental" entity. *See*

Defs.' Br. 2, ¶3; Both ACH and its employee Al-Shami are thus susceptible to suit under Section 1983. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002).

**A. Eighth Amendment claim against Al-Shami**

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; *Robinson v. California,* 370 U.S. 660 (1962). In *Estelle v. Gamble,* 429 U.S. 97 (1976), the United States Supreme Court affirmed that the Eighth Amendment may be implicated by the state's failure to provide proper medical care to a prisoner:

> [D]enial of medical care may result in pain and suffering which no one suggests would serve any penological purpose . . . . The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "[i]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

429 U.S. at 103–104 (citations omitted). Pre-trial detainees are entitled to the same protections as convicts serving out prison sentences. *See Minix v. Canarecci,* 597 F.3d 824, 831 (7th Cir. 2010).

Generally, a state official violates the Eighth Amendment rights of a prisoner if he or she displays "deliberate indifference" to the prisoner's medical needs. *Estelle,* 429 U.S. at 104; *Farmer v. Brennan,* 511 U.S. 825, 835 (1994). Courts have fleshed out this standard further into a two-part test, comprised of objective and subjective components. *See generally Boyce v. Moore,* 314 F.3d 884, 888–889 (7th Cir. 2002). First, the medical condition that is the subject of the mistreatment must be a serious matter: "The deprivation suffered by the prisoner must be objectively sufficiently serious; that is, it must result in the denial of the minimal civilized measure of life's necessities." *Walker v. Benjamin,* 293 F.3d 1030, 1037 (7th Cir. 2002) (citing *Gutierrez v. Peters,* 111 F.3d 1364, 1369 (7th Cir. 1997)). Second, the prison official must have

acted with a subjectively culpable state of mind, often equated with recklessness—greater culpability than mere negligence, if perhaps less than outright malicious intent. *See Haley v. Gross,* 86 F.3d 630, 641 (7th Cir.1996); *Walker,* 293 F.3d at 1037. A plaintiff must show "that the defendants actually knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk." *Haley,* 86 F.3d at 641.

When the state actor is a medical professional, the law imposes a more specific threshold for constitutionally actionable misconduct. A doctor or other practitioner's "deliberate indifference may be inferred when 'the medical professional's decision is such a substantial departure from accepted judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" *King v. Kramer,* 680 F.3d 1013, 1019 (7th Cir. 2012) (quoting *Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 261–262 (7th Cir. 1996)). Thus, while a prisoner "is not required to show that he was literally ignored" by a medical professional, it is insufficient to allege mistake or medical malpractice; the course of treatment must be "so blatantly inappropriate" that a reasonable fact-finder could infer subjective indifference to the prisoner's needs. *See Greeno v. Daley,* 414 F.3d 645, 653–654 (7th Cir. 2005).

There is no question here that Plaintiff has satisfied the first objective prong of the Eighth Amendment standard. The uncontroverted testimony of Dr. Rodgers establishes that Plaintiff suffers from spinal stenosis, a serious condition that worsened progressively during his period of incarceration at the Jefferson County Jail. *See* Rodgers Dep. 5–17; *see generally Williams v. Bearry,* 273 F.3d 1096 (5th Cir. 2001) (denying prisoner's Eighth Amendment claim but implicitly acknowledging spinal stenosis as presenting a "serious medical need"); *Blake v. Coughlin,* 205 F.3d 1321 (2d Cir. 2000) (same). Defendants do not dispute that, upon his transfer

10

from the Jefferson County Jail, Plaintiff had developed a serious medical problem requiring surgery and extensive rehabilitation.

As to the subjective component of the standard, Plaintiff contends that the medical attention Al-Shami gave him, while not nonexistent, was so woefully inadequate that it fails to stand up to constitutional scrutiny. Pl.'s Resp. 19–21. Noting that Al-Shami herself testified that Plaintiff's symptoms were consistent with neurological problems, Plaintiff argues, in essence, that Al-Shami provided him with only superficial remedies like painkillers without making any attempt to grapple with the root causes of his deteriorating condition. *Id.* at 19. Plaintiff maintains that his condition was "emergent" as early as February 2010, and that immediate testing and more aggressive intervention were therefore warranted. Pl.'s Resp. 5, ¶ 13. Drawing an analogy with the Seventh Circuit decision in *Greeno v. Daley,* 414 F.3d 645 (7th Cir. 2005), Plaintiff urges us to conclude from the factual record that Al-Shami's treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his already-serious condition. Pl.'s Resp. 19 (citing *Greeno,* 414 F.3d at 653).

An examination of the record compels us to conclude that Al-Shami's course of treatment was not so consciously reckless—or entirely divorced from the standards of her profession—as to violate Plaintiff's Eighth Amendment rights. Reading the facts in a manner most favorable to Plaintiff's claim, as we must at this stage, we see that Al-Shami saw Plaintiff on at least seven occasions between January 27 and April 14, 2010—a span of less than three months. *See* Pl.'s Exs. 1–20. On his first visit, Plaintiff complained of a shuffling gait, numbness in his left leg, and involuntary contraction of fingers in his left hand; he also told Al-Shami he had a history of sciatica. Vest Dep. 47–52. After a brief examination, Al-Shami theorized that the problem was caused by arthritis and prescribed Ibuprofen—which, according to Plaintiff, was unhelpful. *Id.*

11

On a second visit on February 17, Plaintiff complained of back pain, ambulation difficulties, tremors, and "left lower extremity shakes." Pl.'s Ex. 5. Al-Shami prescribed more Ibuprofen, and she responded to Plaintiff's reports of tremors by prescribing him Amantidine. *Id*; Al-Shami Dep. 50–51. Plaintiff recounts that his symptoms continued to get worse after this visit as well. Vest Dep. 54–56. Although Al-Shami was not present when EMTs responded to Plaintiff's acute episode on February 23, notes from the event were subsequently placed in Plaintiff's medical file and thus were visible to her. Al-Shami Dep. 56–57. Plaintiff testifies that, during this period, Al-Shami did not follow up with him on the effectiveness of his medications. Vest Dep. 66.

When Al-Shami next examined Plaintiff on March 3, she prescribed Neurontin for his neurological symptoms and noted that there should be a "neurology consult ASAP if conditions don't improve with Neurontin." Pl.'s Ex. 9. Plaintiff feels that Al-Shami's efforts at physically examining him were inadequate, and he relates that Al-Shami expressed to him confusion or disbelief about his symptoms: "[She said] she didn't understand why the medication wasn't helping me. She had been working with patients with nerve problems for years, and mine didn't make any sense. She didn't believe me." Vest Dep. 72. Plaintiff was aware as of the March 3 examination, however, that Al-Shami had ordered a consultation for him with a neurological specialist. *Id.* at 73. According to Al-Shami's notes of the next visit on March 8, Plaintiff told her Neurontin was "helping some," and the notes reflect that she therefore prescribed an increased dosage. Pl.'s Ex. 11. Plaintiff denies ever telling Al-Shami that Neurontin—or any of the medicines she supplied him—were alleviating his symptoms. Vest Dep. 71. When she examined Plaintiff in April, Al-Shami recorded his complaint of an additional symptom: "jolts of electricity down his spine." Al-Shami Dep. 89. Plaintiff claims, and Al-Shami admits, that she offered no specific response to this report of electrical jolts; Al-Shami relates that "I have never heard that

12

particular description before," and that she was therefore unable to make sense of that complaint. *Id.* Plaintiff reports that his condition continued to deteriorate; by the time he was transferred from the Jefferson County Jail, he was unable to walk unassisted, and could move his extremities only with difficulty. Vest Dep. 95.

Plaintiff is mistaken in relying on *Greeno v. Daley* to argue that a reasonable fact-finder could infer that Al-Shami was deliberately indifferent to his medical needs. In *Greeno,* the Seventh Circuit found that several prison and medical officials had violated the plaintiff's Eighth Amendment rights, but in circumstances that are readily distinguishable from the case before us. There, a prisoner suffered from severe gastro-intestinal distress and heartburn during a prison term which spanned several years and multiple prison facilities. Apparently because he thought the prisoner was malingering, one official refused for more than six months to prescribe any medication other than Maalox, which only aggravated the prisoner's symptoms. *Greeno*, 414 F.3d at 654–655. Another prison nurse threatened that the plaintiff would be "locked up" if he registered further complaints about his condition. *Id.* at 654. Still another official, a doctor, refused for more than a year and a half to refer the plaintiff to an outside specialist, "doggedly persist[ing] in a course of treatment known to be ineffective—behavior that we have recognized as a violation of the Eighth Amendment." *Id.* at 655 (citing *Kelley v. McGinnis,* 899 F.2d 612, 616–617 (7th Cir. 1990)). The same doctor issued *affirmative* orders that the patient was to have no other medications and no endoscopy; the court held that this "repeated refusal to uncover or effectively treat his condition was a 'gratuitous cruelty.'" *Id.* (citing *Ralston v. McGovern,* 167 F.3d 1160, 1162 (7th Cir. 1999)).

Here, by contrast, there is no evidence that Al-Shami made anything other than a good-faith effort to treat Plaintiff's symptoms. Plaintiff recalls Al-Shami expressing skepticism about

13

some of his symptoms, *see* Vest Dep. 72, and Al-Shami's treatment notes record what she had heard from full-time prison staffers—that Plaintiff exaggerated his symptoms when he felt he was being watched. *See* Pl.'s Ex. 11; Al-Shami Dep. 76.[10] Whatever her skepticism, however, the records indicate that she took Plaintiff's reported symptoms at face value, recording them in her notes and prescribing medication on that basis.[11] Although Al-Shami's initial diagnosis of arthritis was incorrect and her attempts to treat Plaintiff's symptoms with a combination of painkillers and more targeted neurological drugs like Neurontin and Amantidine were ultimately unavailing, she did not display the ostrich-like stubbornness or cruelty of the prison officials in *Greeno*; rather, she continued to try new medications, and she recognized the need for testing and specialist attention after her third visit with Plaintiff. *Cf. Greeno,* 414 F.3d at 654–655. Finally, the record does not show that Plaintiff's complaints were ignored—much less that Al-Shami attempted to threaten or intimidate him; Plaintiff admits that he always received medical attention within two to three days of putting in a sick call. Vest Dep. 47; *cf. Greeno,* 414 F.3d at 655.

In *Duckworth v. Ahmad,* 532 F.3d 675 (7th Cir. 2008), a prisoner whose cancer had been misdiagnosed as a urinary tract infection pressed a constitutional claim against his prison doctors. Noting that the defendants had "responded to [the plaintiff]'s continued complaints in a manner calculated to treat him," the court rejected the plaintiff's attempt to analogize the situation to *Greeno,* and it concluded that such mistakes in treatment are the "kinds of medical assessments doctors can make without running afoul of the Constitution." 532 F.3d at 682. Like

---

[10] Plaintiff additionally points to transcripts of emails between the Department of Corrections and Jail staff as evidence that Jail staff (and thus, apparently, Al-Shami by extension) disbelieved Plaintiff's medical complaints. We agree with Defendants that the content of these emails is inadmissible hearsay. *See* Defs.' Reply 3–4.

[11] Although Plaintiff claims that Al-Shami ignored his report of "electrical jolts" in his legs, her own notes indicate that such a symptom was simply foreign to her understanding. Nonetheless, she continued throughout April 2010 to provide medications targeted at the neurological symptoms of which such "jolts" would be considered a part. *See* Al-Shami Dep. 89.

the prison doctor in *Duckworth* (whose errors persisted over an even longer time period)*,* Al-Shami was slow to grasp the likely root cause of Plaintiff's various problems. *Cf.* 532 F.3d at 682. Here just as in *Duckworth*, however, her trial-and-error approach is not such "a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id*. (quoting *Estate of Cole,* 94 F.3d at 261–262). Even Plaintiff's expert Dr. Rodgers, who testified that earlier and more aggressive intervention in Plaintiff's case would have produced better results, affirmed that the six weeks of "conservative" therapy for spine-related complaints is within the realm of a reasonable medical response to such symptoms. Defs.' Br. 7, ¶ 48 (citing Rodgers Dep. 72).

The Eighth Amendment "does not require that prisoners receive unqualified access to health care"; nor does it mandate that they receive the "best" care, or that the treatment protocols be efficacious. *See Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006). Even negligence which would constitute medical malpractice does not violate a prisoner's constitutional right to adequate health care, so long as subjective indifference to a serious medical need cannot be inferred from the evidence presented. *See King*, 680 F.3d at 1019. Here, Al-Shami's course of treatment, whatever its shortcomings, was not so egregious that it met that high threshold for misconduct. Summary judgment is accordingly GRANTED as to Plaintiff's Eighth Amendment claim against Defendant Layla Al-Shami.

## B. Eighth Amendment Claim Against ACH

Plaintiff claims that Advanced Correctional Health, as an entity, violated his Eighth Amendment rights because "through its policies, procedures, and customs it failed to provide guidance to Defendant Al-Shami as to timely testing and/or treatment once a serious medical condition was recognized." Pl.'s Resp. 20; *see also* Compl. ¶ 73–74. Our conclusion as to the

claim against Al-Shami dictates that Plaintiff's claim against ACH, too, fails to survive summary judgment.

It is well established that private corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (quoting *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690–691 (1978)). In order to show that his "injury was the result of the municipality's or corporation's official policy or custom," however, any plaintiff must first establish that he suffered an underlying constitutional deprivation at the hands of one or more of the entity's employees. *Id.*

Here, as we have previously explained, Plaintiff has failed to show that Al-Shami violated his Eighth Amendment rights, and he presents no evidence sufficient to establish that anyone else under the aegis of ACH did so either. His complaint does allege that an unnamed "jail doctor, a Defendant ACH employee," diagnosed him with carpal tunnel in response to a request for medical attention in 2009. Compl. ¶ 12. More seriously, it also alleges that an ACH employee jail doctor "refused to allow EMS [to] take Mr. Vest to the hospital." *Id.* at ¶ 28. However, Plaintiff testifies in his deposition only that that he "was told" (presumably by an EMT) that a doctor had refused him permission to go to the hospital. Vest Dep. 60. Plaintiff's account is contradicted by his own signature on a form stating that he *refused* to be transported; even if we accept his version of events as true, however, a second-hand allegation against an unnamed ACH employee is far short of sufficient to establish that this jail doctor exhibited deliberate indifference in violation of the Eighth Amendment. Where, as here, a plaintiff has not established that a constitutional injury took place, a "custom or policy" claim stemming from this notional injury fails as a matter of law. *See Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864,

866 (7th Cir. 2013) ("It is unnecessary to decide what the [corporate defendant]'s policy may be, since [plaintiff] has not established a constitutional problem with his treatment and thus did not suffer actionable injury from the policy he attributes to the corporation"). Summary judgment is accordingly GRANTED as to Plaintiff's Eighth Amendment claim against Defendant ACH.

## II. Conclusion

With respect to the medical treatment of prisoners, the Eighth Amendment provides safeguards against only against grave abuses—the infliction of "unnecessary suffering" offensive to our society's notions of "civilized standards, humanity, and decency." *See Estelle*, 429 U.S. at 104. It is not a substitute for state laws regarding medical malpractice, and its protections are not triggered by mere failure to live up to the standard of professional care expected of physicians and nurses. *Id.* at 106. Plaintiff has not demonstrated that his treatment by Al-Shami or ACH constituted a deprivation of his right to be free of cruel and unusual punishments. Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claims (Counts I and II) is accordingly GRANTED.

IT IS SO ORDERED.

Date: ___01/27/2014___

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

J. Clayton Culotta
CULOTTA & CULOTTA LLP
clay@culottalaw.com

Michael Gary Smith
KAHN DEES DONOVAN & KAHN
msmith@kddk.com

Michele S. Bryant
KAHN DEES DONOVAN & KAHN
mbryant@kddk.com