UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| DAVID VEST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) No. 4:12-cv-00039-SEB-TAB |
| LAYLA AL-SHAMI, | ) |
| ADVANCED CORRECTIONAL | ) |
| HEALTHCARE, INC., | ) |
| | ) |
| Defendants. | ) |

## **SECOND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the motion of Defendants Layla Al-Shami and Advanced Correctional Healthcare, Inc. for Summary Judgment [Docket No. 40], filed on May 15, 2013 pursuant to Federal Rules of Civil Procedure 56. Having previously granted summary judgment in favor of Defendants on Plaintiff's federal claims, we now DENY summary judgment on the remaining state-law claims for the reasons set forth below.

## **Factual and Procedural Background**

### **Facts[1]**

Plaintiff David Vest was arrested on child pornography and child exploitation charges and incarcerated at the Jefferson County Jail in Madison, Indiana on April 30, 2009. Def.'s Br. 2. He remained incarcerated there until his custody was transferred to the Indiana Department of Corrections on April 16, 2010. *Id.* Defendant Advanced Correctional Healthcare, Inc. ("ACH") is a medical services organization that, during the time of Plaintiff's incarceration, was under

---

[1] Our recitation of the facts here is the same as set forth in our Partial Grant of Defendants' Motion for Summary Judgment. *See* Docket No. 65.

1

contract with Jefferson County to provide medical services at the Jefferson County Jail. Compl. ¶ 8. Defendant Layla Al-Shami is a registered nurse practitioner, employed by ACH, who served in the Jail as a "site practitioner" during the time of Plaintiff's incarceration Compl. ¶ 7; Defs.' Br. ¶¶7–9.

At the time of his arrest in April 2009, Plaintiff told officers as part of his intake procedure that he was experiencing some "tingling" in his fingers and toes. Vest Dep. 33–34. He did not initially ask for medical attention, nor was he taking any medication for these symptoms at the time. *Id.* Several days after his arrival at the Jail, Plaintiff was beaten by other prisoners, suffering injuries to his head, shoulders, and face. *Id.* at 35–36. In the aftermath of this assault, Plaintiff reported that he was experiencing greater numbness and tingling in his hands and feet. Compl. ¶ 11. Upon putting in a "sick call"—a request for medical attention at the Jail—Plaintiff saw a member of the jail medical staff and was given Tylenol. *Id.* at 12–13. In September 2009, Plaintiff put in three sick calls to complain of what he thought were sciatica symptoms. Jail medical staff members saw him on three occasions, prescribing Ibuprofen; according to Plaintiff, the medication did not relieve his symptoms. *See* Compl. ¶ 14–15; Pl.'s Ex. 1. Plaintiff asked for and received medical attention five times during the course of 2009. Pl's Ex. 1. [2]

In December 2009, Plaintiff began to experience involuntary contraction of the third and fourth fingers of his left hand, difficulty walking on his left leg because it was "dragging," leg tremors, and pain in his limbs. After putting in a sick call two days earlier, he saw a jail nurse on January 26, 2010; Al-Shami then examined him on January 27.[3] Defs.' Br. 4, ¶¶ 14–16. Noting that his gait and musculoskeletal strength (assessed using a grip test) seemed normal, Al-Shami

---
[2] Plaintiff's Exhibit 1 lists Layla Al-Shami as the "provider" for these 2009 visits, but Defendants maintain that other jail personnel actually administered the care. Def.'s Br. 3 n.1. The records of these 2009 visits have not been introduced by either party into the record.
[3] Al-Shami expressed uncertainty whether the primary jail nurse, whom she refers to as Denise Housen, was an employee of ACH. *See* Al-Shami Dep. 119.

deemed the symptoms consistent with arthritis and prescribed Ibuprofen to alleviate pain. Pl.'s Ex. 2. Plaintiff put in another sick call on February 14, after which he was examined by the jail nurse on February 16 and by Al-Shami on the following day. While being examined by Al-Shami, Plaintiff complained of back pain and difficulty with ambulation as well as tremors; he also noted to her that he had a history of "benign muscle spasms" in his family. Pl.'s Ex. 5. Al-Shami recorded that he presented with a shuffling gait, tremors in his limbs and difficulty straightening the third and fourth fingers in his left hand, but she also recorded that his "activities of daily living" remained intact. *Id.* She prescribed Ibuprofen for pain and Amantadine for the tremors, and wrote that he should be monitored for difficulties with daily living activities and any worsening of symptoms. *Id.* The jail nurse saw Plaintiff again the next day, and noted that he manifested "[no complaints of] pain or discomfort. Slow to move, no tremors noted when being talked with by nurse. Able to move and use [bilateral upper extremities] and [bilateral lower extremities.]" Pl.'s Ex. 6; Defs.' Br. 4, ¶ 21.[4]

On February 23, 2010, Plaintiff awoke on the floor of his cell and had difficulty in standing up; he felt numbness and weakness in his legs and on the right side of his body. Compl. ¶¶ 23–25. Jail staff contacted King's Daughters' Hospital in Jefferson County, which dispatched EMTs to the Jail in response to Plaintiff's distress. Defs.' Br. 4, ¶ 22. Plaintiff believed at the time that he had suffered a stroke, and the responding EMTs measured his blood pressure at the high level of 140/120. Compl. ¶¶ 27, 31. While being treated by the EMTs, Plaintiff signed a form stating that he "refused" to be transported to the hospital. *See* Pl.'s Ex. 7. While he does not deny signing this form, Plaintiff maintains that he was in such distress at the time that he did not read or understand what he was signing; Plaintiff insists now that he wanted to go to the hospital

---

[4] The nurse's note uses abbreviations which Defendants have translated in a manner not objected to by Plaintiff.

but the EMTs told him that would not be possible.[5] Vest. Dep. 59–60. After this incident, Plaintiff was placed on "medical watch" to allow jail staff to monitor his symptoms more closely. Defs.' Br. 5, ¶ 24.

According to Plaintiff, his symptoms steadily worsened; he reported increasing numbness and tremors coupled with extreme difficulty in walking—to the point that he had to use a wall to steady himself or seek assistance from other inmates. Pl.'s Ex. 9. He saw Al-Shami again on March 3, 2010, and she noted that Plaintiff's presentation of symptoms conflicted with the reports of jail staff, who related that Plaintiff was "functioning and walking fine" when not being watched by medical personnel.[6] *Id.* She nevertheless observed several objective symptoms, including tremors and a strength of grip that was weaker in his left hand than his right. *Id.* Al-Shami prescribed Neurontin to combat the neurological symptoms and the tremors, and she wrote that Plaintiff should undergo a "neurology consult ASAP if condition doesn't improve [with] Neurontin"; she also ordered that Plaintiff remain on medical watch for another week with monitoring of symptoms. *Id.*[7] According to her testimony, it was also at this time that Al-Shami ordered MRI and CT scans for Plaintiff, though the scans were not ultimately performed until later. *See* Al-Shami Dep. 95. Five days later, Al-Shami examined Plaintiff again. According to

---

[5] Neither the EMTs nor Kings' Daughters' Hospital are defendants in this matter, nor are they affiliated with Al-Shami or ACH.

[6] In her deposition, Al-Shami denies ever believing that Plaintiff was "malingering," but she stated that the contrast between self-described symptoms (many of which were subjective rather than objectively measurable) and the observations of jail staffers was a factor to be taken into account in her attempts to analyze Plaintiff's condition—as a supplement to her independent observations and judgment. *See* Al-Shami Dep. 111–113.

[7] Plaintiff disputes that Defendant Al-Shami ever "ordered" the neurological consult. While not denying that she made notations that such a consult should be conducted, he apparently contends that she never conveyed this order to prison personnel responsible for scheduling off-site medical attention. *See* Pl.'s Resp. 3. The only evidence cited by Plaintiff for this proposition is the report submitted by Dr. Stephen Payne, who opined that there was "no evidence that a neurological consultation was ordered at that time, and no evidence that the primary-care provider, Layla Al-Shami, attempted in any way to expedite consultation or testing for David Vest." *See* Docket No. 48, Ex. 5 at ¶ 2. The record as it stands is devoid of conclusive evidence that Al-Shami communicated her order that Plaintiff receive a neurological consultation immediately following the March 3 examination; for the purposes of this summary judgment motion we accept as undisputed only what the record affirmatively shows: that Al-Shami recorded the need for a consultation in her patient notes for Plaintiff on March 3, and repeated the notation on several subsequent occasions.

4

her patient notes, Plaintiff told her that the Neurontin was helping ease his symptoms; she therefore increased his dosage and additionally prescribed Colace to alleviate the constipation he reported. Pl.'s Ex. 11. In his deposition, Plaintiff maintains that neither Neurontin nor the other medications prescribed by Al-Shami mitigated his symptoms, and he denies having reported to al-Shami that the Neurontin was effective during the March 8 examination. Vest Dep. 71. Plaintiff visited the Jail nurse again on March 16 and March 23; the nurse continued Plaintiff's medical watch status pending the neurology consult. Pl.'s Exs. 12, 13.

Al-Shami examined Plaintiff twice more in April 2010. On April 6, she reviewed the notes of the Jail nurse who had seen Plaintiff the previous day, and she recorded: "Staff states inmate sleeping all the time . . . . Increased Neurontin not helping signs and symptoms. Vital signs have been stable. General condition same." Al-Shami Dep. 88–89. Plaintiff also reported to Al-Shami that he had "jolts of electricity down his spine," and he expressed a desire to schedule his neurology consultation before his upcoming trial date. *Id*; Pl.'s Ex. 16. Al-Shami testifies that, despite her experience in treating patients with neurological issues, she was unfamiliar with the "electrical jolts" Plaintiff described to her. Al-Shami Dep. 89. Al-Shami also testifies that, after her April examinations of Plaintiff, she discussed Plaintiff's case with other ACH staff and expressed concern to jail officials about the delay in the neurological consultation that she had requested for Plaintiff.[8] *Id.* at 96–97, 119. According to Al-Shami, the responsibility for scheduling and coordinating off-site visits rested with Jail staffers. *Id.* at 119.[9] Al-Shami testifies that as of April 2010, she viewed Plaintiff's status as "urgent, but not emergent"—meaning that

---

[8] According to Al-Shami, she spoke to Dr. Norman Johnson and her father Dr. Al-Shami—both affiliated with ACH—and with jail commander Ken Baker.
[9] Plaintiff points to a different portion of Al-Shami's deposition, where she states: "Sending the patient off-site was at the discretion of the practitioner." Al-Shami Dep. 29. However, this remark appears to be referring to medical staff members' ability to order/request that off-site appointments be made rather than their responsibility to arrange for scheduling and transportation of the prisoners—a mandate she later affirms rests with Jail officials.

5

his symptoms were not improving adequately with the treatment available at the Jail, but that his life signs were stable and there did not seem to be any "acute" danger. Al-Shami Dep. 122.[10]

On April 16, 2010, Plaintiff was transferred out of the Jefferson County Jail to the Indiana Department of Corrections in Plainfield, Indiana, and neither Al-Shami nor any other ACH employees had further contact with him. Compl. ¶ 53; Def.'s Br. 7. In an examination at Wishard Hospital, Dr. Richard B. Rodgers diagnosed Plaintiff with spinal stenosis. Dr. Rodgers performed cervical spine fusion surgery on April 23, 2010 to address Plaintiff's condition. Compl. ¶ 60. Plaintiff pleaded guilty to the charges against him, and served the remainder of his sentence in Plainfield, after which he was released to King's Daughters' Hospital in Jefferson County. As of February 2013, he was residing at a nursing facility in Bedford, Indiana, and treatment for his spinal stenosis was ongoing. According to Plaintiff, despite rehabilitation efforts, he remains a "quadriplegic C3 incomplete," with only limited use of all four of his extremities. Vest Dep. 111. Dr. Rodgers, whose group has been responsible for Plaintiff's treatment and rehabilitation since his initial surgery in 2010, opines that earlier diagnosis or surgical intervention would likely have improved Plaintiff's long-term prognosis: "If there had been some intervention at a time when he had started to notice weakness, then definitely his neurological outcome would have been different . . . . [O]nce it becomes symptomatic and you start to notice progression in symptoms, it continues to be progressive until there's an intervention." Rodgers Dep. 15–16.

---

[10] Her full explanation was as follows:
> [H]is condition was not improving with my plan of care and was in need of further treatment and evaluation as soon as possible to avoid any type of deterioration that could possibly occur. [Not] [e]mergent meaning his vital signs were stable. He was, as far as my notes can tell, able to get around okay, take care of himself okay. His activities of daily living were okay, from my assessment . . . . He wasn't having an acute episode of something that would need immediate evaluation."

## Procedural Background

Plaintiff filed this suit on April 3, 2012. Docket No. 1. Defendants filed their joint Motion for Summary Judgment as to all claims on May 15, 2013. Docket No. 41. We subsequently granted summary judgment for Defendants on Plaintiff's federal claims, concluding that the record did not support Plaintiff's allegation that either of the Defendants had engaged in conduct meeting the elevated "deliberate indifference" standard necessary to prove an Eighth Amendment violation. *See* Docket No. 65.

At the same time as this partial grant of summary judgment, we noted that a jurisdictional obstacle prevented our resolution of Plaintiff's state-law malpractice claim on its merits. Because Plaintiff's failure to exhaust the administrative remedy provided by the Indiana Medical Malpractice Act would deprive us of subject-matter jurisdiction over the state-law claim and state records indicated that Plaintiff's administrative complaint had not yet been closed, we directed Plaintiff to show cause why these remaining claims should not be dismissed without prejudice. *See* Docket No. 66 at 6. This order, issued on January 28, 2014, directed Plaintiff to respond no later than February 14, 2014. *Id.*

On February 13, 2014, Plaintiff filed his Return to Order to Show Cause. Docket No. 67. In this submission, Plaintiff disclosed that, in an April 18, 2012 letter, the Indiana Department of Insurance ("IDOI") had informed him that neither of the Defendants was covered by the Indiana Patients' Compensation Fund. Docket No. 67, Ex. 2. Accordingly, Plaintiff has requested that the IDOI dismiss his administrative file, which that office had still listed as "open pending" at the time our Order to Show Cause was issued. Docket No. 67, Ex. 3. According to IDOI, the matter has been re-classified as "pending close" and will remain in that status for six months, at which point it will be completely purged. Docket No. 67 at 2, Ex. 4. Because a prospective plaintiff is

7

neither permitted nor required to submit a claim to the administrative review board prior to taking court action if the defendants are not "qualified" health care providers, *see Medical Assur. Co., Inc. v. Hellman,* 610 F.3d 371, 373 (7th Cir. 2010) (citing Ind. Code §§ 34-18-6-1, 34-18-15-3, 34-18-15-4) we may exercise jurisdiction over Plaintiff's claim, and he has adequately answered the jurisdictional concerns raised by our Order to Show Cause.

## Legal Analysis

### Standard of Review

Summary judgment is appropriate on a claim if the moving party can show that there is no genuine dispute as to any material fact, leaving them entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the Amere existence of some alleged factual dispute between the parties,@ *id.*, 477 U.S. at 247, nor the existence of Asome metaphysical doubt as to the material facts,@ *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Here, the Defendants as the moving party Abear the initial responsibility of informing the district court of the basis for [their] motion," and identifying those portions of the record which

they believe demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Because Plaintiff, the non-moving party, will bear the burden of proof at trial, Defendants may discharge their burden at this stage of the proceedings by showing an absence of evidence to support Plaintiff's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in Plaintiff's favor, if genuine doubts remain and a reasonable fact-finder could find for Plaintiff, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). But if it is clear that Plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element Anecessarily renders all other facts immaterial.@ *Celotex*, 477 U.S. at 323.

## Discussion

**I.     Continued Exercise of Jurisdiction**

Plaintiff's Complaint was premised on federal question jurisdiction, *see* Compl. ¶ 1 (citing 28 U.S.C. §§ 1331, 1343, & 2201), and supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367. *Id.* at ¶ 2. We have now granted summary judgment on all claims arising under federal law, leaving for review only the medical malpractice claims based on Indiana law.

Ordinarily, district courts will remand supplemental state-law claims when the federal claims providing the court's original basis of jurisdiction have been dismissed. *See RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012). "[T]he district court has

9

broad discretion to decide whether to keep the case or relinquish supplemental jurisdiction over the state-law claims. A general presumption in favor of relinquishment applies." *Id.* However, courts may maintain jurisdiction when, in their judgment, "judicial economy, convenience, fairness, and comity[] will point to federal decision of the state-law claims on the merits." *See Wright v. Associated Ins. Companies, Inc.,* 29 F.3d 1244, 1251 (7th Cir. 1994).

Here, the parties satisfy the criteria for an exercise of diversity jurisdiction pursuant to 28 U.S.C. § 1332. *See generally* Docket No. 67 at 2. Plaintiff David Vest is a resident of Indiana. Compl. ¶ 6. Defendant Layla Al-Shami is a resident of California, see Docket No. 67 at 2,[11] and Defendant ACH is an Illinois corporation with its primary place of business in Illinois. Docket no. 67, Ex. 5.[12] Although Plaintiff did not set forth diversity as a basis of jurisdiction in the Complaint, complete diversity of citizenship is nonetheless evidenced on the complaint's face. *See* Compl. ¶¶ 6–8. Lastly, we agree with Plaintiff that the amount in controversy in this matter exceeds $75,000.[13] We find the likely presence of diversity as an independent basis for jurisdiction a persuasive reason to exercise our discretion to maintain supplemental jurisdiction over the state-law claims pending before us.

---

[11] The Complaint recites that Al-Shami is a resident of Kentucky, *see* Compl. ¶ 7, but, according to Plaintiff's return to the order to show cause, she has since moved to California.

[12] Exhibit 5 attached to the return to the order to show cause is a corporate registration document reflecting that ACH is incorporated in Illinois. Although it maintains a registered agent in Indiana—subjecting it to the personal jurisdiction of Indiana courts—all of its listed executives have Illinois addresses. This is sufficient evidence that the corporation's "nerve center" is in Illinois.

[13] If diversity were the sole potential basis for jurisdiction, we would apply more scrutiny to Plaintiff's assertion that the amount in controversy exceeds $75,000, and Plaintiff would bear the burden of proof if the existence of the jurisdictional amount were disputed. *See Sellers v. O'Connell,* 701 F.2d 575, 578 (6th Cir. 1983). However, since our inquiry into the existence of diversity serves here only to inform our decision to retain our pre-existing supplemental jurisdiction, less searching inquiry is required.

## II. The State-Law Claims

Plaintiff's Complaint contains claims against both Layla Al-Shami and ACH for medical malpractice under Indiana law. The first theory of recovery stems from the alleged negligence of Al-Shami; if Plaintiff prevails on this claim, he may recover from either Al-Shami or ACH based on ACH's supervisory liability. Plaintiff also appears to put forth a second theory of recovery, according to which ACH breached the independent duty of care it owed inmates at the Jefferson County Jail. We address these two theories of recovery in turn.[14]

### A. Al-Shami's Malpractice

In order to make a *prima facie* showing of a defendant's liability in negligence for medical malpractice under Indiana law, a plaintiff must establish: "(1) a duty on the part of the defendant in relation to the plaintiff; (2) failure on the part of defendant to conform its conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure." *Oelling v. Rao,* 593 N.E.2d 189, 190 (Ind. 1992); *see also Miller v. Griesel,* 308 N.E.2d 701, 706 (Ind. 1974). A health care provider such as a nurse practitioner owes his or her patients "that degree of care, skill, and proficiency which is commonly exercised by ordinarily careful, skillful, and prudent [nurse practitioners], at the time . . . and in similar localities." *Vergara by Vergara v. Doan,* 593 N.E.2d 185, 186 (Ind. 1992).

Defendants do not dispute that Defendant Al-Shami, as a nurse practitioner serving at the Jefferson County Jail, owed Plaintiff a duty of reasonable care. *See* Defs.' Br. 18. Rather, the parties dispute whether Plaintiff has sufficiently established Al-Shami's breach of that duty.

---

[14] The headings in the Complaint state that the malpractice claims are "Causes of Action III and IV," but "Cause of Action IV" is never discussed in detail. We will therefore address the medical malpractice claims according to the theories of recovery, disregarding the confusing headings used by Plaintiff.

Generally, expert testimony is required to establish what degree of care is reasonable in a given set of circumstances and whether a defendant's conduct fell short of that standard; failure to do so should result in summary disposition of the claim. *See Widmeyer v. Faulk,* 612 N.E.2d 1119, 1122 (Ind. Ct. App. 1993) (noting that exceptions to this principle may exist when "a jury can understand the medical professional's conduct without technical explanation").

Here, Plaintiff has submitted the affidavit and report of Dr. Stephen Payne, a board-certified internist. *See* Docket No. 58, Ex. 1; Docket No. 48, Ex. 4.[15] Dr. Payne opines that Al-Shami fell below the applicable standard of care in at least two respects. First, he faults her diagnosis and treatment of Plaintiff in connection with his examination on February 17, 2010:

> The physical exam included a new gait abnormality . . . new inability to straighten his L[eft] 3rd and 4th fingers, and new tremors in his bilateral lower extremities. It was, or should have been, obvious to Al-Shami on 2/17/10 that Mr. Vest's differential diagnosis included a neurological disorder that had worsened over the past several weeks. The differential diagnosis should have included cervical spinal cord compression, but <u>any</u> neurological disorder that had progressed over several weeks' time was potentially serious and required timely evaluation, at least within the next several days. Al-Shami did not formulate a reasonable differential diagnosis for Mr. Vest's symptoms and physical findings and did not order timely testing or consultation to try to explain them. Her failure to do these things was a breach of the standard of care.

Docket No. 58, Ex. 1 at 2 (emphasis original). He also states that Al-Shami's next examination report, on March 3, should have included a differential diagnosis. The second major respect in which Dr. Payne finds Al-Shami's treatment sub-standard concerns her diligence in procuring testing and further outside attention for Plaintiff once she did determine it to be necessary:

> The standard of care for any primary-care medical provider in any institution is that the primary-care provider be familiar enough with the medical system within

---

[15] Dr. Payne's report, as originally designated as part of Plaintiff's evidence in response to the motion for summary judgment, was unaccompanied by a sworn statement and thus inadmissible. *See Wittmer v. Peters,* 87 F.3d 916, 917 (7th Cir. 1996). However, Magistrate Judge Baker granted Plaintiff's motion to amend the exhibit to include Dr. Payne's sworn declaration. Docket No. 62.

12

> that institution that he or she can ensure appropriate treatment of his or her patient within that institution, be it an office, a hospital, a nursing home, or a jail. In this specific case, it appears from the records and from Layla Al-Shami's testimony, that she eventually saw the need for a neurology consult and testing for David Vest, but that she did nothing to ensure that it happened in a timely manner. In that failure, she again was below the standard of care.

Docket No. 58, Ex. 1 at 3. This expert opinion, coupled with the deposition testimony of Richard Rodgers, M.D.—who testified that Al-Shami's course of treatment resulted in harm to Plaintiff and other approaches "would have been better," Rodgers Dep. 80—is sufficient to survive a summary judgment motion on the question of breach. Defendants have offered no evidence controverting these submissions with respect to the state-law claims; their only relevant argument is that Dr. Payne's report is inadmissible—a defect that the Court has since authorized Plaintiff to correct. *See* Defs.' Br. 19.

Finally, there is sufficient evidence in the record for a reasonable juror to infer that Plaintiff suffered damages as a result of Al-Shami's negligence. Dr. Rodgers opined that "[i]f there had been some intervention at a time when he had started to notice weakness, then definitely his neurological outcome would have been different." Rodgers Dep. 15–16. Plaintiff himself testifies that the inadequate and delayed treatment of his condition has severely hampered his mobility and contributed to his need for assisted-living services. Vest Dep. 111. Plaintiff has thus made out a viable *prima facie* claim for medical malpractice against Al-Shami, and, as Defendants concede, ACH can be held liable for Al-Shami's medical malpractice within the scope of her employment. *See* Def.'s Br. 19; *see generally Vogler v. Dominguez,* 624 N.E.2d 56, 63 (Ind. Ct. App. 1993) (outlining applicability of *respondeat superior* principles).

**B. ACH's independent negligence liability**

At different points in the Complaint, Plaintiff alleges that ACH is also negligent for breach of its "duty . . . to staff the facility with competent medical personnel with the ordinary skill and knowledge to provide medical services," its "failure to properly monitory and supervise its employees," and "its failure to implement and/or enforce policies and procedures regarding the referral of patients to outside physicians when their staff is incapable of diagnosing and treating unknown and persistent symptoms of inmate patients." Compl. ¶¶ 80, 94, 95.

We may assume for the purposes of this motion that ACH owed a duty of care to Plaintiff both with respect to the standard of treatment he received under its auspices and with respect to its hiring, training, and supervision practices. *See Putnam Cnty. Hosp. v. Sells,* 619 N.E.2d 968, 971 (Ind. Ct. App. 1993) (placing a negligence claim against a hospital for, *inter alia,* negligent training and supervision and negligent treatment of a patient in a surgery room within the rubric of the Medical Malpractice Act rather than premises liability). However, Plaintiff's evidence is insufficient to establish that ACH breached any such duty. Plaintiff points to two types of evidence in support of this negligence theory. First, in connection with "failure to train" liability, he notes that ACH gave Al-Shami only a one day orientation, and that the "procedures and protocols" manuals she received contained only "general guidelines" rather than more specific instructions. Pl.'s Resp. 14, ¶ 48–49 (citing Al-Shami Dep. 24–25). Second, Plaintiff alleges Al-Shami told Dr. Norman Johnson, an ACH executive, about Mr. Vest's case, but that Johnson "fail[ed] or refus[ed] to direct Defendant Al-Shami to expedite testing and/or treatment of Mr. Vest in in a timely manner." Pl.'s Resp. 15, ¶¶ 50, 52 (citing Al-Shami Dep. 98).

Neither the standard of care owed by a medical services company in training its nurse practitioners nor the standard of proper supervision of employees' treatment decisions is amenable to easy interpretation by a jury of lay people. As with most medical malpractice allegations—with the exception of those alleging egregious, instantly-recognizable misconduct like leaving surgical implements in a patient's wound—expert testimony is therefore required to establish a breach of the applicable standard of care. *See Methodist Hosps., Inc. v. Johnson,* 856 N.E.2d 718, 721 (Ind. Ct. App. 2006). *Cf. Bowman v. Beghin,* 713 N.E.2d 913, 916–917 (Ind. Ct. App. 1993) (discussing the scope of exceptions to the general rule). Here, Plaintiff has offered no expert evidence supporting its conclusion that the conduct it alleges by ACH was sub-standard; Dr. Payne's expert report discusses only the conduct of Al-Shami. Since none of the alleged conduct is so obviously negligent that the breach speaks for itself, Plaintiff has not established that ACH breached a duty it owed him. We therefore conclude that supervisory liability is the only theory through which ACH may be found liable for medical malpractice negligence.

## **Conclusion**

Plaintiff has set forth a *prima facie* case that Defendants Al-Shami and ACH are liable for medical malpractice, although only *respondeat superior* is a viable avenue of recovery against ACH. Defendants' Motion for Summary Judgment on these remaining claims is accordingly DENIED.

IT IS SO ORDERED.

Date:   02/24/2014

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

15

Distribution:

J. Clayton Culotta
CULOTTA & CULOTTA LLP
clay@culottalaw.com

Michael Gary Smith
KAHN DEES DONOVAN & KAHN
msmith@kddk.com

Michele S. Bryant
KAHN DEES DONOVAN & KAHN
mbryant@kddk.com